[Crim. No. 29171. Second Dist., Div. Three. May 25, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD SANDOVAL, Defendant and Appellant.

76

**COUNSEL**

Dennis L. Cava, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Gary R. Hahn, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**POTTER, J.**—Defendant Edward Sandoval appeals from the judgment revoking his probation. On February 25, 1975, defendant pleaded guilty to second degree robbery (Pen. Code, § 211). On March 18, 1975, imposition of sentence was suspended and defendant was placed on formal probation for five years. The conditions of probation included, among others, that he spend 1 year in the county jail with credit for 91 days served and that he obey all laws.

On May 7, 1976, defendant was arrested on a robbery charge arising out of an incident in J. C. Penney's parking lot in San Fernando. At approximately 8:30 p.m., a man "came up behind" the victim, Mrs. Keeling, "snatched" her purse off her arm, knocking her down and spraining her wrist. The victim saw "the back" of her assailant as he was running across the parking lot with the purse in his hand. Earlier, she had seen a man in the crosswalk as she exited from the store; she had, however, only "glanced up" at his face for a second or two and "didn't pay attention to him."

Laurie Massey heard the victim scream, turned around and saw "this guy" from the back run past her with a purse. He was wearing overalls, a long-sleeved, dark, plaid "[P]endleton" shirt and had shoulder length dark hair. A light blue "patterned" van drove up, the robber "hopped" in on the passenger side, and the van left. "About a minute or two" later, the victim and witness informed a police officer in a patrol car of the robbery. The victim described the man she had seen before the purse-snatch as "Mexican" with black hair and a mustache. Ms. Massey described in detail the robber's clothing and the van. The police broadcasted the report of the robbery and the descriptions.

About five minutes after hearing a police broadcast, Reserve Officer Casper spotted a van which matched the broadcast description, at the intersection of Hubbard and Fourth Streets. He followed it down a dead-end street where the van parked temporarily "under a street light." Casper drove by the van twice, saw defendant in a plaid shirt in the van and jotted down the license number. Casper then located Officer Hatfield in a patrol car about three blocks away and relayed the information, including the license number. This additional information was then broadcast.

At about 8:45 p.m., Officer Hatfield stopped the blue van as it was exiting from the Boys Market parking lot. He arrested the three persons

in the van: defendant, Mr. Garza, and Ms. Valadez. Defendant was the only person whose appearance and clothing fit the broadcast description. Reserve Officer Casper also identified him as the man he had just seen a few minutes previously in the parked van. No money was found on defendant. Garza and Valadez, however, had in their possession bills and coins matching the denominations described in great detail by the victim (e.g., two $20 bills, three $5 bills, four quarters. etc.).

As the van was stopped by Hatfield, a private citizen, Mr. Haddock, pulled up. He explained to the officer that he had been following the van. He had heard the police broadcasts on his car radio which was equipped with a "police scanner device." As he was driving up Hubbard Street towards Boys Market, he observed the van, with the license number mentioned on the broadcast, enter the parking lot. He followed it to the rear of the market where he saw Garza and Valadez get out of the vehicle, place an "object" in a trash bin, and re-enter the van. The van then exited from the lot and was intercepted by Hatfield. Haddock returned with the police to the rear of the market where the victim's emptied purse was retrieved from the trash bin.

Approximately 30 to 45 minutes after the robbery, the victim who was sitting in a room at the police station was told by the police that the suspect would be brought "through the hallway." As defendant passed, the victim identified him as the man she had seen in the crosswalk, recognizing him "by his face." The witness, Ms. Massey, was also in that room. In response to the police inquiry whether the man who "was walking by" was wearing the "same kind" of clothes as she had seen on the purse snatcher, she replied that "[t]hose were the same clothes" that she had previously described to the police immediately after the robbery.

On May 18, 1976, a preliminary hearing was held on charges arising out of the purse snatching. Defendant was bound over to answer on one count of robbery (Pen. Code, § 211). His codefendants Garza and Valadez were held to answer on one count of receiving stolen property (Pen. Code, § 496).

On July 26, when the cause was called for trial, the public defender announced she was ready. The case (No. A 135593) was dismissed, however, because of the People's failure to proceed. Later that day, proceedings with respect to defendant's probation revocation, based on the same incident, were conducted. Defendant denied the violation. The public defender stated that she had just read the probation report and requested a continuance. She asked that the matter be set for "hearing

setting." The court granted the continuance for "the purpose of a hearing," set the matter for "hearing" on July 30, and ordered the probation officer to be present.

On July 30, the revocation hearing was held. Counsel stated she was "not ready" and requested a further continuance. She relied upon (1) her inability to subpoena witnesses in three days' time, coupled with her concern as to whether the People would "refile"; (2) her mistaken impression that the July 30 date was for "hearing setting" only; and (3) her uncertainty as to whether the charged violation was based only on "the alleged purse snatch." The motion to continue was denied. Defendant's motions to exclude and strike the "identification" testimony of the victim and the eyewitness were also denied, and their testimony with respect to the "identification" and the events which occurred was received. The parties stipulated to the admission in evidence of the preliminary hearing testimony of Officer Hatfield, Reserve Officer Casper and Mr. Haddock. Officer Hatfield was also cross-examined by defendant.

The court found defendant in violation of probation. Probation was revoked and sentence was imposed. At defendant's request,[1] he was "sentenced" to the Youth Authority, instead of to state prison, for the term prescribed by law. The court denied the defense request for credit for one year served in the county jail on the ground that it "was served as a term of probation." Although the court indicated it did not think that the credit applied to the Youth Authority, the court stated that it would "note" that defendant had served 90 days in custody awaiting the trial and revocation proceedings. No notation of credits, however, was entered on the judgment (order of commitment to the Youth Authority). This appeal followed.

### Contentions

Defendant contends: (1) the court improperly denied his motion for a continuance; (2) the court committed reversible error by admitting in evidence (a) the victim's identification of him, and (b) the witness' identification of his clothing; and (3) the court erroneously denied him credit for time served as a condition of probation.

We have concluded, for the reasons that follow, that the judgment should be affirmed, as modified to reflect credit for time served as a

---

[1]Defendant was under 21 at the time of the original offense.

condition of probation and in custody awaiting proceedings on the violation.

*Denial of a Continuance Was*
*Not An Abuse of Discretion*

Defendant contends that the court abused its discretion by refusing to grant him a further continuance "for a reasonable period of time" so that the codefendants could be subpoenaed in his behalf. We disagree.

Our Supreme Court has long pointed out that " '[i]t is a settled rule of practice that an application for a continuance is addressed to the sound discretion of the trial court.' " (*People* v. *Collins,* 195 Cal. 325, 332 [233 P. 97].) Its determination as to whether a defendant has affirmatively demonstrated that justice requires granting the motion "will not be disturbed on appeal in the absence of a clear abuse of that discretion." (*People* v. *Duck Wong,* 18 Cal.3d 178, 189 [133 Cal.Rptr. 511, 555 P.2d 297]; *People* v. *Serrata,* 62 Cal.App.3d 9, 16 [133 Cal.Rptr. 144].)

The question of whether a particular denial of a continuance is an abuse of discretion must necessarily turn on the circumstances of each case. (*People* v. *Reaves,* 42 Cal.App.3d 852, 856 [117 Cal.Rptr. 163].) Where defendant, as here, alleges the absence of witnesses as the ground for a continuance certain conditions must be met. As was stated in *People* v. *Buckey,* 23 Cal.App.3d 740, 744 [100 Cal.Rptr. 551]: "The granting of a continuance on the ground of the absence of a material witness is subject to certain well established conditions designed to prevent unwarranted delay in criminal prosecutions. These conditions are: '(1) a particular obtainable witness [ ]; (2) materiality of the evidence [ ]; (3) the necessity of his testimony [ ]; and (4) diligence to obtain his attendance [ ].' (Witkin, Cal. Criminal Procedure (1963) p. 273.)"

Defendant apparently claims he was unable to have crucial defense witnesses present at the revocation hearing because of either or both of the following circumstances: (1) inability to subpoena witnesses within the few days' time granted by the earlier continuance; and (2) a mistaken conception that the matter was set just for the purpose of a "hearing setting," not for the actual "hearing." The record reveals that while the court clearly indicated it was continuing the matter for a probation revocation hearing, the public defender had requested that it be set for a "setting date" at which time presumably a date for the

hearing would first be determined. It also appears from the record, however, that there was another reason for the inability to subpoena witnesses. Counsel stated she had not definitely decided "whether to call the co-defendants as witnesses"; her decision would depend on the People's decision "whether or not" to refile charges. Defendant did not have the right to a continuance to await the People's decision in this respect.

Moreover, even if we assume that "due diligence" (*People* v. *Collins, supra,* 195 Cal. at p. 333) was exercised by defendant, no showing has been made that defendant would have benefited by the testimony of any witness he failed to produce. ▮ The court, in deciding a continuance motion, "must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result. . . ." (*People* v. *Laursen,* 8 Cal.3d 192, 204 [104 Cal.Rptr. 425, 501 P.2d 1145]; *People* v. *Hill,* 64 Cal.App.3d 16, 34 [134 Cal.Rptr. 443].) ▮ · The only witnesses referred to by defendant at the hearing and on appeal were his codefendants. Although they had been discharged after the dismissal of the case on July 26, presumably they could be physically located. There was, however, no offer of proof that defendant reasonably expected favorable testimony from them. Defendant has failed to demonstrate how they could exonerate defendant without implicating themselves. Because of their Fifth Amendment privilege against self-incrimination, these witnesses were, therefore, not reasonably "obtainable." (*People* v. *Buckey, supra,* 23 Cal.App.3d at p. 744.) Since defendant was not deprived of a likely benefit, he has failed to show the abuse of discretion or prejudice to him necessary to secure a reversal of a judgment for denial of a continuance. (See *People* v. *Laursen, supra,* 8 Cal.3d at p. 204; *People* v. *Hill, supra,* 64 Cal.App.3d at p. 34.)

▮ Nor can defendant claim he was denied "substantial justice" (*id.*) on general grounds of being forced to proceed unprepared without adequate notice. Defendant was afforded notice of the charges and the meaningful opportunity to prepare for and defend against the charged violation in accord with established due process requirements for a probation revocation hearing. (See *Morrissey* v. *Brewer* (1972) 408 U.S. 471, 489 [33 L.Ed.2d 484, 499, 92 S.Ct. 2593]; *People* v. *Coleman,* 13 Cal.3d 867, 873 [120 Cal.Rptr. 384, 533 P.2d 1024]; *People* v. *Vickers,* 8 Cal.3d 451, 457 [105 Cal.Rptr. 305, 503 P.2d 1313].) Although the public defender in arguing for a continuance stated that she was not ready and was not sure as to whether any other violation than the purse snatch was involved, the record reveals otherwise. She had announced that she was

ready for trial on the 1976 robbery charge four days earlier. She had also read and received the probation report at that time. That report indicated that the "purse snatch" was the only violation. She chose not to challenge the report or to cross-examine the probation officer who was present at the July 30 revocation hearing. If counsel were ready to cross-examine the same witnesses and offer a defense to the same underlying robbery charge on July 26, we cannot see why she should have been unprepared on July 30. Moreover, she did actively participate and cross-examine witnesses on July 30. Furthermore, the conduct of the revocation hearing revealed that counsel was also well acquainted with the testimony at the preliminary hearing. Certain parts of the transcript of that hearing were admitted by stipulation; other parts were used to cross-examine the People's witnesses on their prior testimony. Thus, defendant has not demonstrated he was prejudiced or unduly burdened by the denial of the continuance.

 Finally, in reaching its determination, the court was obliged to consider the burden a postponement would impose on the witnesses and the court who were present and ready to proceed. (See *People* v. *Laursen, supra,* 8 Cal.3d at p. 204.) Under the total circumstances herein, the denial of the continuance motion cannot be deemed an abuse of discretion.

*Admission in Evidence of the Victim's*
*Identification Testimony Was Harmless*
*Error*

 Defendant contends it was reversible error to admit in evidence the victim's in-court identification of him. He claims that the identification was "tainted" by "impermissibly suggestive pretrial identification procedures" at the police station, and that without this testimony "there was virtually nothing to link [him] to the robbery." We disagree.

By denying defendant's motions to strike and exclude the "identification" testimony, the trial court impliedly found that (1) the pretrial single person showup was not excessively suggestive, or (2) if it were so suggestive, the in-court identification was independent of that pretrial procedure. On review, we, therefore, must determine whether there is substantial evidence to support the court's finding. (*People* v. *Gomez,* 63 Cal.App.3d 328, 336 [133 Cal.Rptr. 731].)

■ The governing principles are well-established. If the pretrial procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" (*Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967]; *People* v. *Rist,* 16 Cal.3d 211, 217 [127 Cal.Rptr. 457, 545 P.2d 833]), then the "admission of evidence of identifications based thereon resulted in a denial of due process" (*People* v. *Bisogni,* 4 Cal.3d 582, 585 [94 Cal.Rptr. 164, 483 P.2d 780]; see *Neil* v. *Biggers* (1972) 409 U.S. 188, 196 [34 L.Ed.2d 401, 409, 93 S.Ct. 375].) ■ A "single person showup is not necessarily unfair." (*People* v. *Bisogni, supra,* 4 Cal.3d at p. 587; see *Stovall* v. *Denno* (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967].) Such a procedure should not be used, however, without a "compelling reason" (*In re Hill,* 71 Cal.2d 997, 1005 [80 Cal.Rptr. 537, 458 P.2d 449]) because of the great danger of suggestion from "a one-to-one viewing [which] requires only the assent of the witness" (*People* v. *Martin,* 2 Cal.3d 822, 829 [87 Cal.Rptr. 709, 471 P.2d 29]). Whether a single showup violated due process must be determined in the light of all the circumstances of the case. (*Neil* v. *Biggers, supra,* 409 U.S. at p. 196 [34 L.Ed.2d at p. 409]; *People* v. *Bisogni, supra,* 4 Cal.3d at p. 587.) ■ If the showup was tainted, the in-court identification is admissible only if it "had an origin independent of any pretrial identification procedure." (*People* v. *Williams,* 9 Cal.3d 24, 37 [106 Cal.Rptr. 622, 506 P.2d 998].)

■ Applying these principles to the case herein, we conclude that there was no substantial evidence to support the court's implied finding. There was "no emergency present requiring a single person showup." (*People* v. *Bisogni, supra,* 4 Cal.3d at pp. 586-587.) The pretrial identification was "impermissibly suggestive" under the circumstances. The victim was told by the police before she saw the defendant that they would bring the suspect through that hallway because they were bringing others through another way. She affirmed that when she saw him she "understood" that he was the man the police "thought" had "snatched" her purse. Thus, as in *Bisogni* (*id.,* at p. 587), "the procedure followed in effect suggested" to the victim that defendant was the robber.

Moreover, there was no evidence that could support a finding that there was an independent origin for her in-court identification of defendant. To the contrary, the victim acknowledged that the fact that the police showed the defendant to her at the station "helped" her make her in-court identification by "cementing the man's face in [her] memory."

■ The error in admitting in evidence the victim's tainted in-court identification, however, was harmless beyond a reasonable doubt. (See *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824].) *It is patent that her identification of defendant as a man she had seen prior to the robbery was of minimal evidentiary value since she had not even seen the face of the man who had grabbed her purse. She only identified the defendant as the man she had seen in the crosswalk as she was entering the parking lot prior to the robbery.*

In contrast, as the previously recited facts disclose, there was ample untainted, highly probative evidence linking defendant to the commission of the robbery. As was stated in *People* v. *Malich,* 15 Cal.App.3d 253, 263 [93 Cal.Rptr. 87], admission of a tainted identification is harmless error when "the combination of admissible tokens of identity is so compelling that the tainted courtroom identification itself becomes surplus to the array of influences inducing the verdict." The testimony of the other witnesses (Massey, Casper, Haddock and Hatfield) provided overwhelming evidence supporting the court's finding that defendant violated his probation. Admission in evidence of the victim's identification of him was, therefore, harmless beyond a reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at p. 710]; *People* v. *Chi Ko Wong,* 18 Cal.3d 698, 722-723 [135 Cal.Rptr. 392, 557 P.2d 976]; see also *Harrington* v. *California* (1969) 395 U.S. 250, 254 [23 L.Ed.2d 284, 287, 89 S.Ct. 1726].)

### *Admission of the Witness' "Identification"*
### *of Clothing Was Proper*

■ Defendant also challenges Ms. Massey's in-court "identification" of defendant's clothing as "tainted" by prior "impermissibly suggestive" procedures. The contention is without merit.

There could be no "likelihood of irreparable misidentification" of defendant. (*Simmons* v. *United States, supra,* 390 U.S. at p. 384 [19 L.Ed.2d at p. 1253]; *People* v. *Rist, supra,* 16 Cal.3d at p. 217.) The witness never identified the defendant at all. At the police station she only stated that he was wearing the "same" clothing as that worn by the man who ran past her with the victim's purse. At the hearing, moreover, she clearly indicated she would be unable to identify any person. She testified only that the clothing in the photograph of defendant exhibited to her was the "same or similar" clothing to that worn by the purse snatcher. It was for the court as trier of fact to weigh the statistical

probability that another individual wearing a similar dark plaid shirt and coveralls would be found in the immediate vicinity of the robbery within a short period of time in the light blue van from which the victim's purse was discarded. (Cf. *People* v. *Collins,* 68 Cal.2d 319 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176].) Consequently, there was no error.

In any event, Ms. Massey's "identification" of the clothing was properly received because it "had an origin independent of any pretrial identification procedure." (*People* v. *Williams, supra,* 9 Cal.3d at p. 37.) The witness testified that her "identification" of the clothing in the photograph exhibited at trial was based upon her recollection of the incident. This was confirmed by the fact that the clothing in that photograph matched the detailed description given by Ms. Massey to the police within a minute or two of the robbery and at least a half hour before she saw defendant in the police station.

### *Credits for Presentence Time Should Have Been Granted*

Defendant contends that he should have received credit for one year that was served as a condition of probation, pursuant to Penal Code section 2900.5. The People respond that the provisions of that section do not apply to a commitment to the California Youth Authority (hereinafter CYA) pursuant to Welfare and Institutions Code section 1771[2] upon conviction of a felony. For the reasons that follow, we have concluded that Penal Code section 2900.5, as recently amended, is applicable to limit the maximum duration of a CYA commitment and that the judgment must be modified accordingly.

Initially, we note that Penal Code section 2900.5 was amended in the 1976 session of the Legislature. (Stats. 1976, ch. 1045, § 2.) We are in accord with the conclusion of the court in *People* v. *Hunter,* 68 Cal.App.3d 389, 391 [137 Cal.Rptr. 299], that "the statutory history of the amendment to section 2900.5 and the rule of construction of sentencing statutes declared by our Supreme Court in *In re Estrada* (1965) 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948] require that the 1976 amendment to section 2900.5 be construed as effective to sentences imposed prior to the effective date by judgments not yet final on January 1, 1977." Conse-

---

[2]This section provides in pertinent part: "Every person convicted of a felony and committed to the authority shall be discharged when such person reaches his 25th birthday. . . ."

quently, the amended section applies retroactively to the case at bar; it provides in relevant part:

"(a) *In all felony and misdemeanor convictions,* either by plea or by verdict, when the defendant has been in custody, including but not limited to any time spent in a jail, camp, work furlough facility, halfway house, rehabilitation facility, hospital, prison, or similar institution, *all days of custody* of the defendant, *including days served as a condition of probation* in compliance with a court order, *shall be credited upon his sentence,* . . .

"(b) For the purposes of this section, credit shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted.

"(c) For the purposes of this section, *'sentence'* includes any fine or period of imprisonment imposed as a condition of probation or otherwise ordered by a court in imposing or suspending the imposition of any sentence, and also *includes any term of imprisonment,* including any period of imprisonment prior to release on parole and any period of imprisonment and parole, prior to discharge, whether established or fixed by statute, by any court, or by any duly authorized administrative agency. . . .

"(d) *It shall be the duty of the court imposing the sentence to determine the total number of days to be credited* pursuant to the provisions of this section. The total number of days to be credited shall be contained in the abstract of judgment provided for in Section 1213." (Italics added.)

 We do not construe the present language of Penal Code section 2900.5 as precluding its application to the sentences of felons committed to the CYA. By its express terms, the statute applies to *all* felony and misdemeanor convictions and provides for credit for the time a defendant has spent in custody as a condition of probation and awaiting proceedings "related to the same conduct." (Pen. Code, § 2900.5, subds. (a), (b).) Moreover, as this court has previously stated: "Commitment to the Youth Authority constitutes pronouncement of sentence (*People v. Navarro,* 7 Cal.3d 248, 271 [102 Cal.Rptr. 137, 497 P.2d 481])." (*People v. Getty,* 50 Cal.App.3d 101, 107, fn. 4 [123 Cal.Rptr. 704].) In the

case at bench, the court specifically announced that it was imposing sentence for the 1975 second degree robbery conviction and committing defendant to the CYA for the term prescribed by law. ■■■ We consider that the "term" of incarceration in the CYA institution as a result of the commitment is included within the reference to "any term" or "period of imprisonment." Furthermore, the 1976 amendment deleted former subdivision (c) which had contained language limiting its application to persons "delivered into the custody of the Director of Corrections," a separate department from the Youth Authority. The present statute contains no such restrictive language.

Moreover, a statutory construction excluding youthful felons committed to the CYA from the benefits of section 2900.5 would constitute a denial of equal protection under the rationale of *People v. Olivas,* 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375]. In *Olivas,* our Supreme Court held that "youthful misdemeanants may not constitutionally be held subject to the control of the Youth Authority for any period of time in excess of the maximum jail term which might be imposed" (*id.,* at p. 239) for the same offense if committed by a person over the age of 21 years. In so holding, the court invalidated Welfare and Institutions Code section 1770[3] as a denial of equal protection insofar as it authorized a commitment potentially longer than the maximum jail term permitted by statute. (*Id.,* at p. 257.)

The same principle applies to youthful felons. We are here confronted by a situation, as in *Olivas,* where the defendant was a member of the specifically designated "subclass of persons [convicted of a public offense] who may be committed to [CYA] by reason of section 1731.5 . . . ." (*Id.,* at p. 240.) As the court in *Olivas* pointed out in its analysis of the challenged classification scheme: "[S]uch persons have been prosecuted *as adults,* adjudged by the same standards which apply to *any competent adult,* and convicted *as adults in adult courts.* [Fn. omitted.]" (*Id.,* at pp. 242-243; italics in original.) *Olivas* would appear to compel our conclusion that insofar as such felons "may be subjected to significantly greater terms of incarceration as a result of those convictions solely by reason of their age . . . . such a sentencing scheme constitutes a denial of equal protection in violation of article I, section 7, of the California

---

[3]This section provides in pertinent part: "Every person convicted of a misdemeanor and committed to the authority shall be discharged upon the expiration of a two-year period of control or when the person reaches his 23d birthday, whichever occurs later, . . ."

Constitution and the Fourteenth Amendment to the United States Constitution.... [Fn. omitted.]" (*Id.,* at p. 243.)

In *Olivas,* the court concluded that "personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions." (*Id.,* at p. 251.) A sentencing scheme which affects that interest is subject to strict scrutiny: "[*T*]*he state* must first establish that it has a *compelling* interest which justifies the law and then demonstrate that the distinctions drawn by the law are *necessary* to further that purpose." (*Ibid.*; italics in original.) The *Olivas* court rejected the People's suggestion that the state's interest in the treatment and rehabilitation of youthful offenders justified the sentencing scheme. The court found that "[a]ssuming arguendo that rehabilitation is a compelling state interest" (*id.,* at p. 255), the People had failed to make the requisite showing that "youthful offenders *necessarily* require longer periods of confinement for rehabilitative purposes than older adults" (*id.,* at p. 256; italics in original). Similarly, we find that neither the goal of rehabilitation nor the "amenities" (*id.,* at p. 253) of confinement in a CYA institution justify holding youthful felons committed to the CYA longer than other felons convicted of the same offense but sentenced to state prison. Thus, insofar as Welfare and Institutions Code section 1771 would operate to authorize control beyond the maximum prison sentence, it suffers from the same constitutional infirmity as its companion statute, section 1770.[4]

Our conclusion that the *Olivas* principle applies to other than misdemeanors finds support in *People* v. *Herron,* 62 Cal.App.3d 643 [133 Cal.Rptr. 287]. The court in *Herron* was presented with the issue of a CYA commitment under a "wobbler" (felony-misdemeanor) statute. While the court rejected the defendant's contention that the maximum permissible CYA commitment was the amount of time he could have been sentenced as a misdemeanant to county jail under Penal Code section 12020, it ordered the judgment modified to provide that his CYA commitment could not extend beyond the maximum authorized by that statute for a felon sentenced to state prison. (*Id.,* at p. 651.)

For adults committed to state prison, the maximum sentence is reduced by the precommitment credits authorized under Penal Code

[1]We also note that the Legislature has recognized the rationale of *Olivas* and applied it (at least in part) to juvenile commitments to CYA. (See Welf. & Inst. Code, §§ 726, 731.)·

section 2900.5.[5] Since we hold a youthful felon cannot be held longer than his counterpart in state prison, he, too, should be afforded his 2900.5 credits against that maximum. Defendant, therefore, is entitled to the 1 year and 90 days credit on his second degree robbery sentence that he would have received if he were sentenced to state prison.

 The People's argument to the contrary is not persuasive. The People rely on *In re Keele,* 53 Cal.App.3d 70 [125 Cal.Rptr. 492], and the former language of Penal Code section 2900.5 for their contention that presentence credits do not apply to a commitment to the CYA. The People have not shown how the potential disparity in maximum length of incarceration resulting from denial of such credits can be justified as necessary to a compelling state interest. In *Keele,* the court did not even reach the equal protection issue. It merely held that section 2900.5 had no application to the petitioner's "continuance date" set by the CYA board because it was neither a statutory minimum term nor a minimum eligible parole date. We are, however, concerned with the maximum, not the minimum, term. The issue herein of credit against the maximum term was not directly posed in *Keele.* It is true that the court did comment that neither the language of the section nor the language of previous court decisions could "be readily interpreted to apply 'back time credit' against such a maximum term" as age 25. (*Id.,* at p. 73.) There is, however, no difficulty inherent in applying such credit against the maximum term an adult felon sentenced to prison could be held and then limiting the CYA commitment to the resulting remainder. Moreover, *Keele* preceded both the 1976 amendment of the statute[6] and the decision of our Supreme Court in *People* v. *Olivas, supra,* 17 Cal.3d 236. In light of the changes in statutory and case law, the People's reliance on *Keele* is misplaced. We conclude that Penal Code section 2900.5 is applicable to the maximum period of a CYA commitment. Accordingly, we modify the judgment to credit defendant for time served both as a condition of probation and in custody awaiting the trial and revocation proceedings.

---

[5]In *People* v. *Olivas, supra,* our Supreme Court noted that the inequity of the sentence and the disparity in the "potential duration of his incarceration" (17 Cal.3d at p. 242, fn. 10) were heightened by the fact that "[u]nder the provisions of Penal Code section 2900.6 [now § 2900.5] he would have been entitled to credit for [90 days in custody] . . . against any jail term which could have been imposed." (*Ibid.* at fn. 9.)

[6]As previously stated, the language limiting its applicability to persons delivered into the custody of the Director of Corrections has since been deleted from the statute. (Cf. former Pen. Code, § 2900.5, subd. (c) (Stats. 1971, ch. 1732, § 2) with present § 2900.5 (Stats. 1976, ch. 1045, § 2).)

## Disposition

The judgment is modified to reflect credit for 455 days served. The clerk of the superior court is ordered to enter the credit on the judgment. As modified, the judgment is affirmed.

Cobey, Acting P. J., and Allport, J., concurred.